Agnes, A.J.
INTRODUCTION
This is a civil action in which the plaintiff Joseph Mongeon (plaintiff) alleges that his insurer, the defendant Arbella Mutual Insurance Company, violated the law, namely G.L.c. 93A and G.L.c. 176D, by refusing to pay him the limits of his automobile insurance policy in a timely manner.
While operating his motor vehicle on October 6, 2000, the plaintiff was struck and injured by the operator of another vehicle who turned out to be uninsured. The plaintiff was taken home by his passenger but returned to the hospital a short time later because he had chest pains. He was admitted to the hospital where a cardiac catheterization was performed. He developed an infection from this procedure and had to return to the hospital where he remained until October 20, 2000. Thereafter, the plaintiff was cared for at a skilled nursing facility until November 17, 2000. About two years later, the defendant tendered the $100,000 policy limits to the plaintiff.
The case was tried without a jury. Based on the credible evidence presented at trial, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
On October 6, 2000, the plaintiff, a retired school teacher who was working as a substitute teacher at Baypath Regional Vocational Technical School, was operating a van in a westerly direction on Canal Street in Milbuiy, Massachusetts with his friend Claire God-bout as a passenger. He was struck broadside on the driver’s side by another vehicle operated by a young woman. At the time of the accident, the plaintiff was leaning against his door which is where the other vehicle struck his van. See exhibit 9. He was upset and shaken up.
*632 Ms. Jennifer Snopko, the operator of the other vehicle, left the scene before the police arrived leaving behind one of her passengers to explain what had happened. The police determined that Ms. Snopko had a revoked license, and that her vehicle’s registration and insurance had been cancelled. The police remained on scene with the plaintiff and his companion for about 10 minutes. Attempts to locate Ms. Snopko following the incident and for the next several days were unsuccessful. The plaintiff was not at fault.
Before the accident, the plaintiff was asymptomatic. About ten years earlier he had suffered a myocardial infarction and had bypass surgery. He had been treated for other conditions as well including high blood pressure. However, his past cardiac problems did not impair any of his life functions or cause him any pain. Immediately after the collision, the plaintiff experienced pain in his shoulder and chest, but he drove about 14 of a mile before stopping to let his friend Claire drive the rest of the way to his home. He only remained there for a few minutes before his chest pains worsened. He decided to seek medical treatment. The pain was so great that Claire drove him to the U. Mass. Memorial Medical Center. The plaintiff had pain in his chest and shoulder which felt like the sensation of pain he experienced prior to the quadruple bypass surgery he had in 1991.
The plaintiff arrived at the hospital within one hour of the accident, but was not registered as a patient until about 9:06 p.m. (69 minutes after the accident). His chief complaint was chest pain and that was the focus of the medical staff which examined him. See exhibit 37.[1] The onset of this chest pain was a result of the trauma suffered by the plaintiff from the collision. In addition, the plaintiff complained of rib pain and shoulder pain.
The defendant Arbella received its first notice of the claim in this case from the insured on October 6,2000. At that time, the plaintiff explained how the accident occurred. There never was a question about whether the plaintiff was liable for the collision. The defendant received its first letter from plaintiffs counsel on October 26, 2000. Exhibit 1.
A cardiac catheterization through the plaintiffs left groin area was performed on October 10, 2000 in response to the complaints of chest pain he had experienced following the collision and his prior history of cardiac problems. The plaintiff was discharged from the hospital that same day. The plaintiff was readmitted to U. Mass. Memorial Medical Center on October 12, 2000 as a result of a post-operative infection in the right groin. An operative procedure was performed on October 15, 2000. On October 20, 2000, he was released from the hospital and transferred to the Auburn Life Care Center where he remained until November 17, 2000.
Prior to the collision, the plaintiff led an active life. After the events of October 6 and the ensuing treatment, infection, and recoveiy, he felt veiy weak and was not able to return to his previous level of activity or to his employment.
When the plaintiff was discharged from Auburn Life Care on November 17, 2000, his medical expenses reasonably and necessarily incurred were in excess of $60,000.
The plaintiff had a policy of insurance with the defendant with policy limits of $100,000. On or about October 22, 2000, the plaintiff signed a release that was requested by the defendant in which he indicated he was still treating for his injuries. This release gave the defendant authority to obtain copies of the plaintiffs complete medical records. See exhibit 10. The parties stipulated and the court finds that the defendant made no further requests of the plaintiff for information.
The plaintiffs claim with the defendant was handled by Matthew Camfield (Camfield), an adjuster employed by defendant Arbella, whose involvement began in November 2000. Camfield was the agent of the defendant. He received a copy of the plaintiffs Personal Injuiy Protection claim (PIP) shortly after it was signed by the plaintiff. See exhibit 10.[2] One of Camfield’s duties was to check on the insurance or non-insurance status of persons operating vehicles which strike vehicles operated by the defendant’s insured such as in this case. As early as October 10, 2000, a claim note made by Debra Gallant, another adjuster working on the plaintiffs case, stated that the status of the operator of the other vehicle was needed because there was “possible uninsured exposure here.” Exhibit 11, Note dated October 10, 2000. Cam-field, however, made no calls to Commerce Insurance Company to check on the status of the operator of the other vehicle. He made no effort to contact the police officer who responded to the scene of the collision or to obtain any information from the driver of the other vehicle.
At no time did the defendant contest or disagree with the plaintiffs account of the basic facts relating to the collision that took place on October 6, 2000. The defendant made no effort to take a statement of the plaintiff until after the plaintiff filed suit in 2002, even though the defendant had a right to do so under the terms of its policy. See exhibit 8. The defendant’s review of the medical facts of the case was limited to the written records. There is no evidence of the plaintiffs failure to cooperate with the investigation or processing of his claim.
Camfield also received a copy of the police report relating to the October 6, 2000 event. That report indicated that the operator of the other vehicle was not insured and that she was cited for that criminal violation. The police report, however, indicated that the operator of the other vehicle was insured by Commerce Insurance Company. There is no evidence in this case that the Massachusetts Registry of Motor *633 Vehicles contained a record at any time after October 6, 2000 which indicates that Ms. Snopko was insured at the time of the collision. Neither Camfield nor any other representative of defendant Arbella checked with Commerce Insurance, the police department, nor the Massachusetts Registry of Motor Vehicles to determine whether Ms. Snopko was insured at the time of the collision.
In order to make a valid recommendation that the defendant Arbella should pay the policy limits to the plaintiff under the uninsured motorist coverage provision of his insurance policy, Camfield was not required to have a letter from Commerce Insurance Company denying that they insured the other operator. Neither the plaintiffs policy of insurance (exhibit 8) nor any written policy or procedure by the defendant places the burden on the insured to establish that the operator of another vehicle who causes injury to him as in this case was in fact uninsured. However, Camfield assumed that the plaintiffs policy (exhibit 8) placed the burden on the plaintiff to establish that the operator of another vehicle who causes injuiy to him as in this case was in fact uninsured.[3]
Counsel for the plaintiff brought his claim to the defendant’s attention by a letter dated October 26, 2000. Exhibit 1. On November 3, 2000, plaintiffs counsel forwarded the police report to the defendant, advised its adjuster, Ms. Gallant, that the plaintiff was hospitalized, expressed the view that the case was worth in excess of the $100,000 policy limits and made a demand for those limits. Exhibit 2. By letter dated December 19, 2000, plaintiffs counsel advised Cam-field that plaintiff was expected to be out of work until June 2001. He also enclosed copies of plaintiffs medical records and again made a demand for the policy limits. Exhibit 3. Camfield replied by letter dated December 21, 2000 in which he stated he could not respond to the plaintiffs demand because “[w]e are in possession of no documentation to confirm that the other party was in fact uninsured at the time of this loss or if in fact her policy was in effect.” Exhibit 4. Camfield added that “it remains unclear if this is an uninsured case,” and expressed doubt about whether the plaintiff was still receiving medical treatment. Exhibit 4.
On January 21, 2001, plaintiffs counsel sent a second copy of the police report to Camfield including a list of the charges filed against the operator of the other vehicle. Plaintiffs counsel also explained that the plaintiffs medical bills at that point were more than $37,000 and lost wages nearly $5,000. Finally, he raised the issue of a violation of G.L.c. 93A and G.L.c. 176D due to the defendant’s failure to make any offer of settlement. Exhibit 5. Mr. Timothy Horgan (Horgan), a Claims Technical Supervisor , responded in writing by a letter dated January 25, 2001 in which he stated that the insurance status of the operator of the other vehicle had not been determined and “[a]bsent any conclusive documentation, we find it difficult to merely accept a notation on a police report and (sic) conclusive proof that Ms. Snopko’s policy was not in effect on the date of the loss. One would think that only Commerce Insurance Co., or any other insurer if she had in fact changed carriers, can make that determination." Exhibit 6. As for the plaintiffs reference to G.L.c. 93A and G.L.c. 176D, Horgan responded that “(w]e would ask why an insurer would pay a claim when the standards for triggering coverage have not been met?” Exhibit 6. With respect to the matter of damages, Horgan stated that due to the pre-existing nature of the plaintiffs condition and “the findings by his own doctors, it is unclear whether or not all of his complaints are directly a result of this traffic accident, nor if the medical expenses are in fact reasonable and necessary as a result of this traffic accident." Exhibit 6. Plaintiffs counsel wrote a letter to Commerce Insurance Company on Februaiy 12, 2001 requesting information about the status of Jennifer Snopko and enclosing a copy of the police report regarding the October 6, 2000 event. On Februaiy 26, 2001, plaintiffs counsel sent Horgan a letter informing him that Commerce Insurance Company advised him that Ms. Snopko’s policy was cancelled on June 12, 2000. Again, he demanded the policy limits for the plaintiff. Exhibit 18.
On March 1, 2001, Camfield responded in writing to the two letters from plaintiffs counsel dated February 12 and 26. Exhibit 16. He stated that the defendant could not have known of the cancellation of Snopko’s policy. “(S)ince we do not present our own claims to the other insurer until our payments are resolved (PIP and collision) Commerce would not notify us.” He also differentiated between the defendant’s responsibility with regard to reimbursement for medical expenses under PIP coverage and uninsured motorist coverage, describing the former as “much broader.”
Based on information submitted it is not entirely clear that a fact finder would rule that your client’s cardiac diagnoses, treatment and recovery period are due solely to this auto accident. It is clear that your client had routine treatments for cardiac complaints and in fact his treatment had deteriorated to become “borderline” prior to this loss. It is also clear that his medical treatments had ended as of November of 2000.
Exhibit 16. Camfield closed his March 1 letter by stating that since it had been established that the case involved an uninsured motorist, the defendant would schedule the plaintiff for an independent medical examination and a review of his medical records.
The defendant arranged for an independent medical examination (IME) of the plaintiff by Dr. Carl Rasmussen which was conducted on May 11,2001. See exhibit 23 (letter to Camfield from Plaintiffs counsel informing him that it would be up to Arbella to supply the *634 examiner with the necessary medical records).[4] This arrangement was made through a vendor known as Boston Medical Evaluations (BME) which handles thousands of such cases each year for a variety of insurance companies. BME’s responsibility is to transmit all necessary medical reports to the physician tasked to conduct the IME and to explain to the physician what kind of examination is requested or what questions are to be answered. Dr. Rasmussen, who testified at the trial, spent between 60-90 minutes with the plaintiff. His examination report states that following the cardiac catheterization performed on October 7, 2000, the day following the collision, the defendant remained hospitalized until October 10, 2000. However, after experiencing a fever and chills, the plaintiff was readmitted to the hospital on October 11. He was found to have a groin infection that required excision, drainage and treatment through November 7, 2000. As of the date of the examination, the plaintiff had not returned to full activities. Exhibit 15.
With regard to the plaintiffs prior history, Dr. Rasmussen reports that the plaintiff had a heart attack in 1990 while he was out shopping. He was hospitalized and had a bypass procedure. He recovered and resumed his activities as a vocational high school teacher. Exhibit 15. In terms of the relationship between the motor vehicle incident of October 6, 2000 and the problems that followed, Dr. Rasmussen noted that “[f]or causal relationship and pre-existing conditions , the history led to his chest pain being considered as potentially cardiac despite his benign course from 1991 which led to him having catheterization with its ensuing complications. Given the long course in-hospital after that procedure, he must have been rather debilitated by this process.” Exhibit 15.[5]
It was Dr. Rasmussen’s view following his examination of the plaintiff on May 11, 2001 and again at trial that the plaintiffs chest pain on October 6, 2000 was proximate to the collision and that the treatment received by the plaintiff at the hospital on October 7, 2000, including the catheterization procedure, was reasonably related to the collision, and was not “elective” in light of the plaintiffs cardiac history. He opined in his May 11, 2001 letter and again at trial that since the plaintiff had no chest pains before the collision and the collision was a stressful event that the plaintiffs post-collision, cardiac symptoms could be related to the collision. At trial, he explained that his subsequent written addendum to his May 11, 2001 report that was dated October 25, 2001 and prepared at the request of Arbella,[6] see note 8 infra, was simply a statement of opinion that the plaintiff did not become involved in a collision because he had a heart attack.
Following receipt of Dr. Rasmussen’s letter, Cam-field did not take any action to supply Dr. Rasmussen with any additional medical records because he believed that Dr. Rasmussen had them all. Camfield read and reviewed the plaintiffs medical records before he sent them to Dr. Rasmussen, and he had no reason to doubt the assessment by Dr. Rasmussen set forth in his letter dated May 11, 2001.
On July 9, 2001, plaintiffs counsel faxed a letter to Camfield and expressed the view that based on Dr. Rasmussen’s report of May 11, 2001, there was a clear causal relationship between the collision on October 6 and the plaintiffs subsequent catheterization and the follow-up complications. Plaintiffs counsel sought to underscore his point by enclosing a copy of Higgins v. Delta Elevator Service Corporations, 45 Mass.App.Ct. 643 (1998), and argued that the plaintiff should receive the policy limits because the law is that where a tortfeasor causes an injury that when combined with a preexisting disease brings about greater harm to the plaintiff than would have resulted from the injury alone, the tortfeasor is liable for all the consequences.[7] Plaintiffs counsel once again suggested that the failure to pay the limits could result in liability under G.L.c. 93A and G.L.c. 176D. Exhibit 12. Camfield responded in writing the following day and explained why he did not believe that payment of the policy limits were warranted. He stated, in part, that
it is not entirely clear that this traffic accident was a contributing factor to your client’s alleged condition and his alleged disability since the date of this accident. Your client was admitted for a myocardial infarction but the examination revealed that no MI had in fact taken place. Nor is there any evidence to substantiate that your client’s chest pain was in close proximity to the time of this traffic accident. It is also clear that the catheterization was listed as “elective” on the medical reports.
Pursuant to your request as well as ours, we have asked for an addendum to Dr. Rasmussen’s report to concern causality. At that point we hope to be able to complete our evaluation of the case.
Exhibit 13.[8] Plaintiffs counsel responded again in writing by a letter to Camfield dated July 12, 2001 in which he restated his view that the plaintiffs medical records indicated a causal relationship between the collision, and the chest pains and follow-up treatment.
In addition to the IME conducted by Dr. Rasmussen, Camfield arranged for a review of the plaintiffs medical records by a company known as Solutions Claim Consultants. A written report was prepared by two consulting nurses on April 10, 2001 and sent to Camfield. Exhibit 19 (25-page report with an addendum). The report opined that the plaintiff “had an extensive, extremely relevant past medical history” based on his heart problems back in 1990. Exhibit 19 at 1. This report, among other things, questions the causal relationship between the events of October 6, 2000 involving the collision and the plaintiffs hospitalization and catheterization on October 7,2000 and notes that the plaintiff “may or may not have had an MVA (motor vehicle accident) in close proximity to *635 this episode of angina. There was no evidence submitted to substantiate the timing of the accident with the onset of chest pain.” Exhibit 19 at 22. The report goes on to theorize that it is not usual for a catheterization to be ordered based on only one episode of chest pain, and the fact that the procedure is described as “elective” “would lead one to believe that it was not necessary to treat the claimant’s recent episode of chest pain.” Exhibit 19 at 22. Notwithstanding the fact that the plaintiffs medical records establish that he experienced chest pains within about 10 minutes of the collision and was admitted to the Emergency Room about 69 minutes after the collision, Camfield concluded, based on the nurses’ report (exhibit 19), that it was a “borderline question” whether the two events (collision and chest pains followed by E.R. admission) were causally related. Camfield rejected the plaintiffs lawyer’s demand for the policy limits. Camfield knew or should have known at this time that “Solutions Claims Consultants” were regarded by defendant Arbella as not qualified to express medical opinions. See Attachment 1 to Plaintiffs Request for Findings of Fact.
Thereafter, by letter dated August 9, 2001, plaintiffs counsel forwarded plaintiffs medical records to Dr. Thomas Synan requesting his assessment of whether there was a causal relationship between the October 6, 2000 collision and the subsequent medical treatment received by the plaintiff. Exhibit 21. Dr. Synan responded in writing by a letter dated October 29, 2001 and opined that in his view there was such a causal relationship. Exhibit 21. Plaintiff s counsel also sought and obtained a medical opinion from Dr. Susan Cummings, a board certified cardiologist, who submitted an affidavit in anticipation of an arbitration proceeding in which she opined that there was a causal relationship between the collision and the onset of cardiac symptoms. Exhibit 20.
In mid-October, plaintiffs counsel made another written demand for the policy limits in a fax to Camfield. Exhibit 28. Camfield responded in writing to plaintiffs counsel by letter dated October 30, 2001. Exhibit 29. In this letter, Camfield enclosed Dr. Rasmussen’s addendum, see note 8 supra, and stated that “there is no evidence to substantiate the timing of his (plaintiffs) chest pain with this traffic accident.” Exhibit 29. There was no reasonable basis in fact for this statement. Camfield further opined that “(i]t is unusual for someone with your client’s medical history to be admitted for 24 hours to rule out MI. In this case it was done. The next step would be for a cardiac stress test but this was not performed on your client ...” Exhibit 29 at 2. There was no reasonable basis in fact for this statement. He also doubted plaintiffs assertion that he had passed his annual stress tests prior to the accident. “It does not appear that this statement is accurate given the volume and nature of his numerous medications. Typically a person who undergoes a successful stress cardiac bypass is pain free and does not require medications beyond aspirin. Since your client was on calcium channel blockers and beta blockers he appears to have been having problems for a while.” Exhibit 29 at 2. There was no reasonable basis in fact for this statement. He referred to the cardiac catheterization performed on the plaintiff on October 7, 2000 as an “ ‘elective’ diagnostic catheterization.” Exhibit 29 at 2. There was no reasonable basis in fact for this statement. Camfield concluded his missive of October 30, 2001 with this assessment:
[i]n reviewing these records it appears quite clear that your client did not suffer a MI from this traffic accident. Your client did not have any immediate onset of complaints. He did not strike his head or his chest in this accident and his physical examinations showed no injury to his neck, back or extremities. The records clearly show that the on-set of his complaints did not take place until well after this accident and were resolved by use of his normal medications. Dr. Rasmussen clearly states that at most he suffered from anxiety from this accident and not from any cardiac condition.
As you are aware, our responsibility in this case is to pay damages which your client is legally entitled to recover from the tortfeaser in this case. Your client has the duty to prove that his alleged damages are causally related to this traffic accident. Given your client’s substantial histoiy of CAD, and the medications he was on, it is clear that he was no (sic) asymptomatic prior to this accident. Your client also made numerous statements that he had suffered this pain before and after his surgery in 1991. There is no evidence to correlate his anginal attack with this traffic accident.
With respect to the catheterization and resulting infections, (sic) The medical records are quite clear. This procedure was “elective” as described in the records and billing. It was not made necessary by this traffic accident. Your client did not suffer an MI as a result of this accident and therefore it appears that this procedure was done in the normal course of his treatments for his pre-existing condition.
Therefore by strict interpretation of the medical records, it would appears (sic) that none of the medical bills and his treatments are a direct result of this auto accident, but rather as result of his ongoing, pre-existing, and progressive diagnoses. Furthermore, there is no evidence to show that your client is medically disabled from working as a result of this traffic accident.
Exhibit 29 at 3. There was no reasonable basis in fact for these statements. Nonetheless, Camfield offered to settle the case for $55,000. Plaintiffs counsel responded in writing by a letter dated November 7, *636 2001 in which he enclosed the opinion letter tendered by Dr. Synan that the cardiac catheterization was made necessary due to the chest pains experienced by plaintiff following the collision of October 6, 2000, and again made a demand for the policy limits. Exhibit 30. Camfield responded to plaintiffs counsel in writing by a letter dated November 15, 2001 in which he restated Arbella’s position, but offered to settle the case for $60,000. Exhibit 31 and 32. Camfield did not forward the report by Dr. Synan (exhibit 30) to Dr. Rasmussen. Defendant Arbella was not influenced in the positions it took by the report submitted by Dr. Cummings (exhibit 20) and there is no reference to this report in defendant Arbella’s file.
Plaintiffs counsel wrote to Camfield again on April 10, 2002 restating points made in earlier correspondence and bringing some additional areas of damages to his attention, but offering to settle the matter for $95,000. Exhibit 33. Camfield responded in writing by a letter dated April 30, 2002 and offered to settle the matter for $62,000.
The plaintiff filed suit in the Superior Court in May 2002. The complaint contains two counts, one for arbitration of the uninsured motorist claim and one for a violation of G.L.c. 93A and G.L.c. 176D.[9] See Exhibit 48. In an assessment of the case made in July 2002, outside counsel took the position that Dr. Rasmussen’s report of May 11, 2001 found a causal relationship between the collision and the follow-up cardiac treatment. See exhibit 48. Shortly thereafter, on July 10, 2002, Peter Carloni, on behalf of defendant Arbella, made a notation in which he agreed with outside counsel’s interpretation of Dr. Rasmussen’s report and concluded that “[w]e should re-evaluate our offer.” Exhibit 11, Note dated July 10, 2002. Ultimately, the defendant approved an offer of the policy limits on or about November 4, 2002. Exhibit 11, Note dated November 4, 2002.
The defendant changed its position despite the fact that there had been no change in the material facts for nearly two years. Notably, the reasoning employed by Camfield when recommending that the defendant offer the policy limits was not based on any facts or reports that were not known by him as of January 2001.
There also was testimony from Mr. Paul F. Amoruso (Amoruso), a consultant with Swift Brook Associates. See exhibit 42 (curriculum vitae). Amoruso has more than 30 years experience in all aspects of processing insurance claims such as the one involved in this case including extensive experience at the local and national level with Liberty Mutual Insurance Company as a claims adjuster, a claims supervisor, a national examiner and an office manager. He has evaluated thousands of claims for damages under the uninsured motorist coverage of the standard Massachusetts Automobile Insurance Policy. He has previously been qualified as an expert witness on insurance company practices and procedures in connection with claims such as the one involved in this case. In preparation for his testimony, he reviewed the defendant Arbella’s claims file, its policy manual and certain depositions. I generally credit his testimony and make the following findings based on said testimony.
Under the terms of uninsured motorist coverage like that involved in this case, the insurer has a duty to investigate and determine (1) whether the coverage is applicable and (2) whether the uninsured motorist was responsible. In a case such as this, defendant Arbella has a duty to investigate this claim just as if it was a regular claim for coverage under the bodily injuiy protection provisions of the standard policy. Even though an insurance company like defendant Arbella has a right to rely on an attorney who is representing its insured, that does not relieve it of its duly to conduct its own investigation about coverage and the scope of liability.
When as in this case the insurer receives information in the form of a police report that indicates the operator of the other vehicle was not insured it has a duty to verify this by checking with the Massachusetts Registry of Motor Vehicles (RMV). Defendant Arbella has the ability to make a computerized inquiry to the RMV but did not do so. Furthermore, defendant Arbella had a duty to contact Commerce Insurance Company to clear up any question about the status of the operator of the other vehicle. Defendant Arbella also had a duty to request and, if possible, obtain a complete copy of the plaintiffs medical records. If there are questions about any of the important facts such as those relating to causation, defendant Arbella has a duly to obtain a statement from the plaintiff and his companion who were under an obligation to cooperate.
I credit the opinion testimony by Amoruso that given the information available to it, the defendant Arbella should have made a determination that there was a causal relationship between the collision and the subsequent no later than January 1, 2001. As of that date, the plaintiffs medicals and other damages were clearly in excess of $60,000. Furthermore, again based on the opinion testimony by Amoruso, defendant Arbella did not act prudently in sending this case out for review on the question of causation because that fact question was not fairly debatable given the close proximity in time and space between the collision, the onset of chest pain, the return to the hospital, the cardiac catheterization that was ordered immediately thereafter, and the subsequent infection that resulted from that procedure. Defendant Arbella did not follow the custom and practice in the industry of putting a question in writing to a physician such as whether there was a causal relationship between the collision and the subsequent treatment in writing so as to avoid any confusion about what was at issue. The letter written by Dr. Rasmussen concerning his examination of the plaintiff on May 11, 2001 was a plain statement that the catheterization that the plain *637 tiff underwent was for the purpose of determining whether he had suffered heart damage as a result of the collision.[10] Once Camfield received Dr. Rasmussen’s report of May 11, 2001, he should have realized that Dr. Rasmussen was confused and should have sent correspondence to him to clarify the situation.
I also credit Amoruso’s opinion that under the circumstances of this case, given the medical history provided to Camfield by the plaintiff, there was no reasonable basis for the view that the reference to an “elective” catheterization was a reference to an optional procedure. Furthermore, any question in that regard should have resulted in a specific follow-up inquiry of hospital staff which had treated the plaintiff or of Dr. Rasmussen.[11]
The demand letter filed by the plaintiffs counsel on January 24, 2001 was proper and reasonable under the circumstances (exhibit 5). The written response by defendant Arbella dated January 25, 2001 was not a reasonable offer of settlement (exhibit 6). The successive offers of settlement by defendant Arbella ($55,000, $60,000 and $62,000) were not reasonable offers of settlement.
DISCUSSION
1.The remedy under G.L.c. 93A and G.L.c. 176D.
Under G.L.c. 176D, §3(9)(f), the defendant Arbella has a duty as an insurer “to effectuate prompt, fair and equitable settlement of claims in which liability becomes reasonably clear.” The test for determining whether there has been a violation of G.L.c. 176D, §3(9) (f) is an objective one — "whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff." Demeo v. State Farm Mutual Automobile Ins. Co., 38 Mass.App.Ct. 955, 956-57 (1995). A violation of the duty to effectuate prompt settlement when liability is reasonably clear which causes injury to an insured gives rise to an action for damages against the insurer under G.L.c. 93A, §9(1). Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 564 (2001).
2.The adequacy of the plaintiffs demand letter.
Under G.L.c. 93A, §9(3), a demand letter must be sent to the putative defendant no later than 30 days before a G.L.c. 93A case is filed to give that party an opportunity “to review the facts and the law involved to see if the requested relief should be granted or denied.” Slaney v. Westwood. Auto, Inc., 366 Mass. 688, 704 (1975). Counsel for the plaintiff sent a written demand letter to the defendant on January 21, 2001 in which he adequately set forth the elements of his claim that the practices of the defendant in not paying the policy limits in a timely manner were unfair and deceptive. See Lord v. Commercial Union Insurance Co., 60 Mass.App.Ct. 309, 317 (2004).
3.The point at which liability was “reasonably clear.”
A. The delay in establishing the uninsured status of the operator of the other vehicle.
The determination of the insurer’s duly under G.L.c. 176D, §3(9)(f) to offer to settle a case involves an application of judgment to the facts and thus depends on the particular facts of each case. When information is provided to an insurer by counsel for its insured about an incident in which it appears that there is coverage and that there is liability, the insurer must be given a reasonable opportunity to review and to evaluate the information, and to attempt to confirm or deny the essential elements of the insured’s claim. See Clegg v. Butler, 424 Mass. 413, 420 (1997). Where, as in this case, an insured operator of a motor vehicle is injured through no fault of his own as a result of the negligence of the operator of another vehicle which strikes the insured’s vehicle, and there is evidence that the operator of the other vehicle is not insured, the insurer has an affirmative obligation to make reasonable efforts to ascertain whether the operator of the other vehicle was or was not insured independent of any efforts made by the insured. The insurer’s duty is greater when, as in this case, the police who investigated the collision report that the operator of the other vehicle is no longer insured and filed a report containing the name of her insurance company.
In the present case, the defendant was made aware at the time the claim was filed that Ms. Snopko was not insured. Under the standard Massachusetts policy of insurance involved in this case, see note 3 supra, when a claim for coverage and benefits is based on the fact that the insured motorist suffered harm due to the fault of an uninsured motorist the insurer has a duty to investigate the facts to determine whether uninsured coverage is applicable, and may not stand by until the insured proves that coverage is applicable.
Within days of the filing of the claim by the plaintiff in this case, Ms. Debra Gallant, an agent of the defendant, made a notation in the defendant’s records that indicates it may be an uninsured motorist claim. Camfield had no good faith reason for not investigating that assertion. Defendant Arbella had easy access to the authoritative source by means of an electronic link to the Massachusetts Registry of Motor Vehicles. Camfield’s lack of initiative was a significant factor in delaying the decision by defendant Arbella to acknowledge liability and offer to settle the case.
This is not a case where an insurance company erroneously relied on “a plausible interpretation of its insurance policy.” See White American Cas. Ins. Co., 53 Mass.App.Ct. 66, 73 (2001). Camfield’s statement in his letter of December 21, 2000 that he could not respond to the plaintiffs demand because “(w]e are in possession of no documentation to confirm that the other party was in fact uninsured at the time of this loss or if in fact her policy was in effect,” exhibit 4, and
*638 Horgan’s letter of January 25, 2001 to the same effect were inaccurate and made without any justification. These statements were not simply examples of bad judgment, negligence or insufficient zeal. The insured’s duty to investigate a case such as the one brought to its attention by the plaintiff is fundamental, especially where the plaintiff presented positive evidence in the form of a police report to the insurer that indicated the plaintiff was not at fault and that the driver of the other car had violated the criminal laws and was not insured.
The delay in ascertaining the uninsured status of Ms. Snopko and the persistent misstatements of fact by Camfield and others were significant because Cam-field did not even begin to consider the question of causation until the question of coverage was resolved. In the circumstances of this case, that conduct was a wilful and inexcusable violation of the defendant insurer’s obligation to its insured under the policy of insurance and contributed to cause harm to the plaintiff.
B. The delay in establishing a causal relationship between the October 6, 2000 collision and the subsequent chest pains, cardiac catheterization and post-operative complications suffered by the plaintiff.
Camfield’s failure to make a fair offer of settlement in the face of the plaintiffs demand letter dated January 21, 2001 was without any justification. By this point in time, it cannot reasonably be said that there was “a legitimate difference of opinion” between the plaintiff and the defendant over the question of coverage or liability. Contrast, Bobick v. U.S. Fidelity and Guar. Co., 439 Mass. 652, 660 (2003). The defendant did not disagree with the plaintiff over the basic facts surrounding the collision. The defendant was aware from third parties as well as the plaintiff that within moments of the collision the plaintiff complained of chest pains. The defendant was aware of no evidence to challenge or contradict the plaintiffs claim that he was asymptomatic before the collision. The medical records provided by the plaintiff to the defendant were assuring in terms of plaintiffs claim of a causal relationship between the collision and the subsequent cardiac symptoms and problems. The plaintiffs medical bills and evidence of lost wages were such that the demand for the policy limits was reasonable and clearly not excessive.
Here, once the coverage question was resolved, the principal reason for the delay in responding to the plaintiffs demands with a reasonable offer of settlement was another erroneous legal judgment by Cam-field and Horgan that under Massachusetts law an insurer is not liable to its insured for damages that represent the aggravation of a preexisting injury. “If the injury causes or contributes to cause the development of a pre-existing disease, the person liable for the injury is liable also for the resulting aggravation. The wrongdoer may be held responsible for the harmful results of the combined effects of his wrongful act and the disease.” Wallace v. Ludwig, 292 Mass. 251, 252-53 (1935). See, in particular, McGrath v. G.&P. Thread Corp., 353 Mass. 60, 62-63 (1967) (“The intestate, a sixty-three-year-old woman with a history of arteriosclerotic disease, sustained head and other injuries as a result of being thrown to the pavement from the car driven by the defendant Peterson in the accident. She was diagnosed at the hospital as having a questionable myocardial infarction, multiple contusions and abrasions, cerebral concussion, and questionable epidural hematoma. The cause of her death was assigned as ‘hemorrhage of brain’ and she died within hours of the accident. All of these factors combine to bring this case within the compass of Wallace v. Ludwig, 292 Mass. 251, 256, which hold a wrongdoer responsible for the harmful results of the combined effects of his wrongful act and a preexisting disease or condition.”). See also Thurlow v. Shaw’s Supermarkets, Inc., 49 Mass.App.Ct. 175, 177 (2000); Pierce v. Nawn, 5 Mass.App.Ct. 224 (1977). The defendant’s agents had no justification or good-faith basis for this erroneous belief about such a fundamental precept of Massachusetts tort law.
Following the plaintiffs demand letter of January 21, 2001, the defendant engaged in further violations of its basic obligations that contributed to the delay in this case. For example, Camfield did not issue clear written instructions to BME or Dr. Rasmussen to enable the IME to be carried out as intended. Furthermore, in view of the observation by Dr. Rasmussen in his letter of May 11, 2001 (exhibit 15) that “the information I received was rather limited and not helpful,” Camfield failed in his duty as an adjuster for the defendant by not contacting in writing Dr. Rasmussen or the consulting firm which employed him to supply or ascertain the identity of whatever additional information was needed by Dr. Rasmussen.
The defendant’s failure to make any offer of settlement until October 30, 2001 and the offer that was made ($55,000) were violations of the insurer’s duty “to effectuate prompt, fair and equitable settlement of claims in which liability becomes reasonably clear.” G.L.c. 176D, §3(9)(f).
The persistent refusal on the part of Camfield and other representatives of the defendant Arbella to initiate any investigative steps to ascertain the status of Ms. Snopko and the unreasonable delay in recognizing the causal relationship between the injuries suffered by the plaintiff and the collision caused by Ms. Snopko constitutes bad faith. See Spiegal v. Beacon Participations, Inc., 297 Mass. 398, 416-17 (1937). Some specific examples of the conduct of the defendant Arbella’s agents that is beyond a matter of simple negligence or zealous representation of the insurer are as follows:
*639 (1) Camfield’s failure to check with Commerce Insurance Company, the police department, or the Massachusetts Registiy of Motor Vehicles to confirm that Ms. Snopko was not insured.
(2) Camfield’s erroneous understanding that the insurance policy (exhibit 8) placed the burden on the plaintiff to establish that the operator of another vehicle who causes injury to him as in this case was in fact uninsured.
(3) Camfield’s unwarranted assertion in his letter dated December 21, 2000 in which he stated he could not respond to the plaintiffs demand because “(w]e are in possession of no documentation to confirm that the other party was in fact uninsured at the time of this loss or if in fact her policy was in effect.” Exhibit 4. Camfield added that “it remains unclear if this is an uninsured case,” and expressed doubt about whether the plaintiff was still receiving medical treatment. Exhibit 4.
(4) The assertion by Mr. Timothy Horgan, a Claims Technical Supervisor, who responded to plaintiffs counsel in writing by a letter dated January 25, 2001 in which he stated that the insurance status of the operator of the other vehicle had not been determined and “(a)bsent any conclusive documentation, we find it difficult to merely accept a notation on a police report and (sic) conclusive proof that Ms. Snopko’s policy was not in effect on the date of the loss. One would think that only Commerce Insurance Co., or any other insurer if she had in fact changed carriers, can make that determination.” Exhibit 6.
(5) With respect to the matter of damages, Horgan’s response to plaintiffs counsel in that same letter that due to the pre-existing nature of the plaintiffs condition and “the findings by his own doctors, it is unclear whether or not all of his complaints are directly a result of this traffic accident, nor if the medical expenses are in fact reasonable and necessary as a result of this traffic accident.” Exhibit 6.
(6) Camfield’s failure to contact in writing Dr. Rasmussen or the consulting firm which employed him after May 11, 2001 to supply or ascertain the identity of whatever additional information was needed by Dr. Rasmussen.
(7) Camfield’s unwarranted assertion in his letter dated July 10 in which he stated that “it is not entirely clear that this traffic accident was a contributing factor to your client’s alleged condition and his alleged disability since the date of this accident. Your client was admitted for a myocardial infarction but the examination revealed that no MI had in fact taken place. Nor is there any evidence to substantiate that your client’s chest pain was in close proximity to the time of this traffic accident. It is also clear that the catheterization was listed as ’’elective’ on the medical reports."
(8)Camfield’s unwarranted assertion in his letter dated October 30, 2001 that “there is no evidence to substantiate the timing of his (plaintiffs) chest pain with this traffic accident.” Exhibit 29.
4. Calculation of Damages.
Under G.L.c. 93A, §9(1), “if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim.” In this case, there is no underlying judgment because the disposition of count one was the result of a settlement. See note 9 supra.[12] Yet, “(w]hether a settlement is eventually reached or not, unjust delay subjects the claimant to many of the costs and frustrations that are encountered when litigation must be instituted and no settlement is reached. Moreover, when an insurer wrongfully withholds funds from a claimant, it is depriving that claimant of the use of those funds. This is precisely the type of damage we have described as appropriately being subject to multiplication in an action . . . under c. 93A.’ ” Clegg v. Butler, 424 Mass. 413, 419 (1997), quoting Schwartz v. Rose, 418 Mass. 41, 48 (1994).
Although the circumstances of this case are unusual, see note 9 supra, this case is nonetheless governed by the rule that where there has been no judgment damages are calculated according to the interest lost on the money wrongfully withheld by the insurer which serves to compensate the wronged insured for the costs and expenses directly resulting from the insurer’s conduct. See Clegg v. Butler, supra, 424 Mass, at 425. In this case, as noted above, by the time of plaintiffs counsel’s letter of January 21, 2001, the insurer should have been aware that it had a duty to pay uninsured benefits to the plaintiff and that the plaintiffs damages warranted payment of the limits of the coverage ($100,000). Since the insurer did not tender the $95,000 settlement offer until November 1, 2002, the delay that is the subject of multiple damages under G.L.c. 93A is approximately 21 months (January 21, 2001 to and including November 1, 2002). Thus, the base level of damages is the interest due to the plaintiff over that period of time. At the statutory rate of 12% per year, the base level of damages are $20,301.55. Based on the above findings that the defendant acted wilfully and in bad faith in withholding a fair and equitable settlement offer for 21 *640 months, I order that the damages should be trebled in accordance with G.L.c. 93A, §9. The amount of the treble damages is $60,904.65.
CONCLUSION
For the above reasons, a judgment shall enter for the plaintiff on count II of the complaint in the amount of $60,904.65, plus costs and attorneys fees. Counsel for the plaintiff is invited to submit an affidavit relating to attorneys fees and costs and counsel for the defendant may respond in writing pursuant to Superior Court Rule 9A. With respect to the defendant’s requests for Rulings of Law, numbers 112, 113, 114, 115,116,117 and 118 are allowed; numbers 119,120, 121 and 122 are denied.

The medical records set forth in exhibit 37 which were available to the defendant Arbella contain notes by physicians and nurses pointing to the plaintiffs complaints of chest pain when he went to the hospital following the October 6 collision. These notes indicate that the plaintiff presented with chest pains “after a motor vehicle accident” and describe the pain as “sharp, substernal chest pain with radiation to the left arm followed by radiation to the right arm.” Exhibit 37.

Defendant Arbella paid $8,000 in PIP benefits to the plaintiff without contesting that the medical expenses were reasonable and necessary. The defendant also paid an additional amount of Med Pay benefits ($5,000) to the plaintiff without objection.

The policy language in question relied upon by Camfield provides in pertinent part that defendant Arbella Insurance Company "will pay damages for bodily injury to people injured or killed in certain accidents caused by uninsured or hit-and-run autos . . . only if the injured person is legally entitled to recover from the owner or operator of the uninsured or hit-and-run auto.” Exhibit 8 at 7. Contrary to the view expressed by Camfield, there is no language in the policy that places the burden of establishing the applicability of the uninsured motorist coverage on the policy holder.

It is evident that there was some confusion on Dr. Rasmussen’s part about what was expected of him. See exhibit 26. See also exhibit 35 (regarding a bill sent to the plaintiff by Dr. Rasmussen for an “office consultation").

In his letter of May 11, 2001, Dr. Rasmussen also states that the plaintiffs medical records from U. Mass, indicate that he was admitted for chest pains to rule out a heart attack. Exhibit 15.

Dr. Rasmussen prepared his addendum, see note 8 infra, as a result of a telephone call from someone on behalf of defendant Arbella. There is no evidence in defendant Arbella’s file of such a call having been made.

In Higgins, supra, the Appeals Court applied the reasoning of the Supreme Judicial Court in Wallace v. Ludwig, 292 Mass. 251, 252-53 (1935). The Wallace case is discussed in the text infra,

In an October 25, 2001 “addendum” to his report of May 11, 2001, Dr. Rasmussen wrote to Camfield on October 25, 2001 and stated that he did not believe there was a “direct” causal relationship between the accident on October 6, 2001 and the plaintiffs heart condition. However, as noted above, Dr. Rasmussen was confused about the purpose of defendant’s request for an addendum. He explained at trial that he did not mean to opine that there was no causal relationship between the collision and the subsequent cardiac symptoms experienced by plaintiff, but simply that the collision had not been caused by a heart attack suffered by plaintiff prior thereto.

In November 2002, after commencement of this action but prior to any arbitration in the case, defendant Arbella offered and tendered the policy limits ($100,000) to the plaintiff. The plaintiff did not accept the tender of the policy limits. The parties were ordered to arbitration with respect to both Count I and Count II by this court (Murphy, J.) [15 Mass. L. Rptr. 619 (12/27/02); 16 Mass. L. Rptr. 93 (2/14/03)].That order was subject to interlocutory appellate review under G.L.c. 231, §118 (para.l) wherein a single justice of the Appeals Court (Kafker, J.) vacated the order compelling arbitration of Count II, but declined, on procedural grounds, to make any ruling with respect to the arbitration order relating to Count I.
Originally, this court ordered that the arbitrator’s award ($275,000) should be confirmed. See Mongeon v. Arbella Insurance Company, Worcester Superior Court (October 7, 2003) (Agnes, J.). Thereafter, relying on Murphy v. National Union Fire Insurance Company, 438 Mass. 529 (2003), where the Supreme Judicial Court reiterated the principle that a plaintiff is not entitled to a judgment as to uninsured coverage benefits in a motor vehicle tort action when the insurer has tendered the full policy limits prior to any arbitration proceeding, this court reconsidered its decision and ruled that plaintiff was not entitled to confirmation of an arbitration award where the insurer tenders the full policy limits prior to the arbitration. Mongeon v. Arbella Insurance Co., 17 Mass. L. Rptr. 124 (Mass. Super. 2003) (Agnes, J.). In such a case there is no dispute requiring arbitration, and thus no basis for the confirmation of an arbitrator’s award. As a result, this court allowed the defendant’s motion under Mass.R.Civ.P. 59(e) to amend the earlier judgment as to count one and to enter in its place a new judgment to the effect that the plaintiffs claim under Count I of the complaint is moot as a result of the offer and tender by the defendant of the $100,000 of uninsured motorist coverage prior to the date of the arbitration hearing, and, provided that the plaintiff has a reasonable opportunity to accept said tender or a new tender on equivalent terms, Count I of the complaint is dismissed.

This is essentially the view taken by outside counsel for the defendant in their assessment of the case made in July 2002. See exhibit 48.

In this regard, I also credit the opinion testimony by Amoruso that an insurance adjuster such as Camfield, while not a medical doctor, is expected to have a level of understanding about medical records that is greater than a lay person. For example, in Dr. Rasmussen’s report of May 11, 2001 (exhibit 15), the observation that the plaintiffs chest pain on October 6-7, 2000 following the collision was “potentially cardiac” in light of the plaintiffs previous history of cardiac disease was not, as Camfield maintained, ambiguous. This is underscored by the interpretation of Dr. Rasmussen’s report made by defendant Arbella’s defense counsel on July 2, 2002. See exhibit 48.

The result reached in this case should not be understood to encourage delays by insurers in offering to settle a case. The fact that when an insurer does delay making a fair offer of settlement in violation of G.L.c. 176D, §3(9)(f), the damages will not necessarily be a multiple of the policy limits or of an arbitration award is a function of the nature of the remedy established by the Legislature in G.L.c. 93A, §9. The remedy under G.L.c. 93A for a willful violation of the insurer’s duty of fair settlement under G.L.c. 176D is limited to a multiple of any “judgment” obtained by the plaintiff, Le., an award of damages “founded on a decision by a court,” Murphy v. National Union Fire Insurance Co., supra 438 Mass, at 532) or, in circumstances such as this case where there is no judgment, the loss suffered by the plaintiff due to the insurer’s delay in payment, Le., interest at the statutory rate on the sum of money represented by the settlement or the policy limits as the case may be. Murphy, supra